**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SUPERIOR BUSINESS MANAGEMENT, INC., SUPERIOR TAX SOLUTIONS, LLC, AND KRIS BENSON<br><br>Plaintiffs,<br><br>v.<br><br>MACIAS GINI & O'CONNELL LLP D/B/A MGO LLP, MGO GROUP LLC, MGO INDIA PRIVATE LIMITED, DANIELLE BERG, INDIVIDUALLY AND AS AN AGENT FOR MACIAS GINI & O'CONNELL LLP, ANTHONY "TONY" SMALLS, III, INDIVIDUALLY AND AS PARTNER OF MACIAS GINI & O'CONNELL LLP, MELANY DIAZ, DANIELLE MARRAZZO, AND NATALIE ENGER<br><br>Defendants. | CIVIL ACTION NO.: |

1

## PLAINTIFFS' COMPLAINT FOR DAMAGES AND TEMPORARY, INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF

COME NOW, Plaintiffs, Superior Business Management, Inc., Superior Tax Solutions LLC, (collectively, "Superior") and Kris Benson ("Plaintiff Benson"), by and through its undersigned counsel, for their Complaint against Defendants Macias Gini & O'Connell LLP d/b/a/ MGO LLP, MGO India Private Limited, (collectively, "MGO"), Danielle Berg ("Berg"), Anthony Smalls ("Smalls"), Melany Perez Diaz ("Diaz), Danielle Marrazzo ("Marrazzo"), and Natalie Enger ("Enger") (collectively "Superior Defendants") and  allege as follows:

### NATURE OF THE ACTION

1.      This action seeks temporary, interlocutory, and permanent injunctive relief and monetary damages for: (1) Defendants' theft of Superior's proprietary trade secrets and highly valuable confidential business, financial, and tax information; (2) Defendants' unlawful use, for financial gain, of Superior's stolen proprietary trade secrets and highly valuable confidential business, financial, and tax information so MGO could open an Atlanta office at minimal cost that was fully staffed to service Superior clients; (3) Defendants' calculated scheme to unlawfully pirate Superior's business and clients through fraudulent misrepresentations to Mr. Benson, defamation, and theft of thousands of electronic client files, including protected tax and banking information, without Superior's knowledge or consent;

(4) Defendants' calculated scheme to unlawfully pirate, pressure, and coerce critical Superior's accounting employees to end their employment with Superior to join MGO to service the stolen clients; and (5) Defendants' ongoing false and defamatory oral and written statements being made by Defendants that have caused employees and clients to leave Superior and join MGO.

2.      Superior, which is owned by Kris Benson, is a leader in providing business management and tax solutions to high-net worth companies and/or individuals.  Following eight years of development, Superior has successfully created a niche market for such services.  Acquiring Superior, its client list, and key employees was an attractive prospect for MGO, a direct competitor of Superior, who had no Atlanta office, with the exception of Berg, who was hired for the sole purpose of expanding MGO's presence in the southeast in her role as President and Chief Experience Officer.

3.      Defendant Smalls was Superior's Managing Director for approximately seven years. Smalls had no ownership interest in Superior. Defendant Diaz was an Executive Account Manager and Tax Compliance Officer for Superior for approximately four and one half years; Diaz was dedicated to providing tax services to Superior's clients. Defendants Marrazzo and Enger were employed by Superior as Accountants who serviced a dedicated client roster of Superior's clients that were specifically assigned to them.

4.     During their employment and association with Superior, Defendants Smalls, Diaz, Marrazzo, and Enger (collectively referred to as the "Superior Defendants") had daily access to proprietary trade secrets and highly valuable confidential business, financial, and tax information of Superior's clients. Such proprietary information included, but is not limited to, Superior's clients' protected financial information, such as social security numbers and dates of birth, tax and banking information, client retainer agreements and rates, client proprietary business information, current and potential client lists, detailed information about client current and future needs and internal corporate structures.

5.     Defendants Smalls and Diaz were key participants in Superior's client development efforts in the tax and business management space, and therefore, had sweeping access, in particular, to sales prospect information, including, but not limited to, client proposals, monthly retainer rates, client contacts, and client lists. Diaz worked on Superior's tax clients and had extensive access to these clients' protected financial information such as tax returns, social security numbers, banking passwords, and bank account numbers and statements. Marrazzo and Enger also had specialized client knowledge and access to proprietary client information in their roles as accountants for Superior's clients and their assignments to service specific client accounts.

6.     Berg became aware of Superior's existence while attending a dinner with colleagues in March 2022 where she was actively trying to solicit business for MGO.  When one of the attendees at the dinner advised Berg that he was pleased with the services he was receiving from Superior, Berg responded that she had never heard of Superior and asked for more information on who Superior was and who owned it.

7.     Berg, armed with this new information, hatched a plan for acquiring Superior's business and its clients for MGO.  Berg then approached Smalls (not Benson the actual owner and CEO of Superior) and enticed him to relay proprietary financial information of Superior's clients and what account manager was assigned to each client in partnership negotiations for Smalls.  Although Smalls told Benson about the MGO opportunity, Smalls represented to Benson that the negotiations with Berg and MGO were for an acquisition of Superior, including Mr. Benson, as a whole. Smalls never revealed to Benson that there was no global deal for Superior as a whole to join MGO.  Instead, while stringing Benson along in bad faith, Smalls surreptitiously negotiated his own partnership position with MGO that was based upon unlawfully pirating Superior's customers, proprietary information, and critical employees to the detriment of Benson and Superior.

8.     Within weeks of their initial contact in April 2022, Berg coerced Smalls

into providing detailed trade secrets and proprietary information by dangling a lucrative partnership offer and a Buy Sell agreement in front of Smalls, which he readily entered into on or about June 15, 2022. Smalls did not tell Benson the true nature of his communications with Berg or reveal that he had actually gone so far as to accept a partnership offer from MGO until he was pressed by Benson to clarify what exactly what happening with the MGO in a telephone call with Smalls and Benson on July 1, 2022-one month after Smalls had signed MGO's partnership agreement.

9.    The drafts of the MGO partnership agreement and the Buy Sell agreement for Smalls were emailed, revised, and finalized through Superior's business email account. The draft agreements detail a litany of Superior's clients that Smalls would bring to MGO, client valuations and fees memorialized in Exhibit A, and in a separate exhibit multiple Superior employees were identified as targets that Smalls would bring as to comprise "his team" at MGO-Diaz, Marrazzo, and Enger. Smalls failed to disclose any of these events to Benson, the owner of Superior, much less obtain his consent to disclose such proprietary confidential client information, for Smalls' own self-serving reasons.

10.    Once Berg had Smalls on board as a partner with MGO, Berg and Smalls set out to raid Superior's clients and its employees for a seamless transition

to the new MGO Atlanta office. And over the course of the next four weeks, all without the knowledge of Mr. Benson, that is exactly what Defendants brazenly did.

11.     Berg, using Smalls and the Superior Defendants, launched an illicit and tireless conspiracy against Superior to usurp all of Superior's clients, its clients' electronic files, including protected financial information and tax files, and critical account manager employees in order to seamlessly transition all of the clients to MGO.

12.     MGO, acting through Berg, and Defendant Smalls, unlawfully hijacked Superior's critical account management personnel by coercing Diaz, Marrazzo, and Enger to end their employment with Superior and accept offers of employment from MGO by June 26, 2022.

13.     On or about June 15, 2022, Smalls and Diaz called Denise Cronin, one of Superior's accountant employees, to discuss the takeover of Superior by MGO. During this call, Smalls and Diaz told Cronin that Mr. Benson was "not on board" with the takeover yet, but he would be eventually; they also told her to expect an offer letter from MGO.

14.     On June 24, 2022, Smalls met with Enger and Cronin regarding the "MGO takeover".  During this meeting Smalls explained to Enger, who had already accepted an offer of employment with MGO, and Cronin, who had not, that the plan

was for them to stay in the same office space Superior was leasing, but that certain Superior employees were not going to be hired by MGO.  Smalls also explained that Superior would continue to service certain clients who would not be coming to MGO.

15.    When Cronin questioned Smalls and Diaz regarding the fact that Mr. Benson was not involved in this meeting or any of the MGO related discussions as the owner of Superior, Smalls falsely represented to Cronin that he also "owned Superior" and therefore, had the right to make decisions that were for the good of Superior and its employees. When Cronin questioned the rush to have the MGO takeover be effective July 1, 2022, Smalls hostilely replied that "he was losing money each month he delayed this" and if they did not transition to MGO by July 1, 2022, the employees would not have benefits until August 1, 2022. Smalls asked Cronin if she wanted to see her offer letter from MGO, and Cronin said yes, she would, but she was not signing anything until she spoke with Mr. Benson because he was the owner of Superior and had hired her.

16.    At that point in the meeting, Diaz and Smalls began talking to Enger about her MGO offer letter and advised Enger that she would start July 1, 2022 and Cronin would start August 1, 2022.  Enger then pressured Cronin to accept the position with MGO because she needed take care of herself and not worry about Mr.

Benson. At that point, Cronin became uncomfortable with the tone of the meeting and left.

17.     MGO, Berg, and Smalls used Diaz, Marrazzo, and Enger  as a direct means to gain access to Superior's computer systems.  MGO employees, acting at the direction of Berg, sent multiple emails to Smalls, Diaz, Marrazzo, and Enger at their Superior emails and directed them to upload all of their clients' proprietary information into a spreadsheet that was then uploaded directly to MGO from Superior's computer systems without Benson's knowledge, much less consent.  The spreadsheet sought critical client data and financial valuations; MGO sent these email requests to the Superior emails of Diaz, Marrazzo, and Enger while they were still employed with Superior and Smalls was still associated as a Managing Director.  Consequently, such directives from MGO and Berg's team resulted in the misappropriation of hundreds of Superior's clients' proprietary files and information without Superior's or the clients' consent and caused irreparable harm to Superior.

18.     Further, Defendant Smalls', Diaz's, Marrazzo's and Enger's computer activity during June and July 2022 reveals, that in the final weeks before they planned to start working for MGO, Diaz, Marrazzo, and Enger, downloaded thousands of Superior's clients' business and tax files containing protected financial and tax information to MGO computer systems for the benefit of MGO and to the

detriment of Superior, including setting up a secret Teams account with a secure link to download client information directly to MGO.

19.     On July 12, 2022, Defendant Marrazzo did not report to work as usual and said she was working from home, which was not normal business practice.  Throughout the day on July 12, 2022, Defendant Marrazzo downloaded thousands of client files for no legitimate business reason.  Mr. Benson was alerted to the unusual activity and took preventative measures to avoid the leaking of any additional client information by Defendant Marrazzo to an unknown location. However, this did not stop the Superior Defendants from continuing to raid the client information located within Superior's computer systems.

20.     Indeed, on July 13, 2022, Diaz, who was on a paid vacation in Jamaica, maliciously accessed Superior's computer systems with the specific intent to circumvent Plaintiff Benson's efforts to block Defendant Marrazzo from the unlawful raiding of clients' information.  Diaz went into Superior's computer systems without authorization, and the with the specific intent to unlawfully download client passwords, bank account, and tax information, and other highly proprietary financial information for the use and benefit of MGO and to the detriment of Mr. Benson and Superior. Diaz and Marrazzo were then terminated along with Smalls and received notice of their terminations on July 15, 2022.

21.     On July 16, 2022, at approximately 3:30 p.m. (<u>after</u> Diaz and Smalls had been terminated) Smalls, Diaz, and Diaz's husband arrived at Superior's office building located at 100 Galleria Parkway in Atlanta, GA.   They presented themselves to the security guard on duty, lied to the guard and claimed that they forgot their access cards and needed the guard to let them access the elevator to be able to go up to Superior's office space.   Both Smalls and Diaz knew their elevator access cards had been deactivated by Benson, but they lied to the security guard anyway to unlawfully gain access to Superior's office.

22.     According to surveillance footage, the security guard then allowed Diaz, her husband and Smalls access to the elevator to go up to the floor where Superior's office was located.   Once they arrived at the office, the footage shows Diaz and Smalls discovering that their office keys no longer work.   Benson had the office rekeyed on July 15, 2022 to prevent any unauthorized access or security breaches by Smalls and Diaz.

23.     Shortly thereafter, according to surveillance footage, and an interview with the security company, Smalls can be seen returning to the guard station, exchanging in dialogue with the security guard, and showing the security guard his phone in an effort to convince the guard to open Superior's doors to the group.   Indeed, Smalls lied to the security guard and told the security guard he was

the "President" of Superior and had also forgotten his door key.

24.     The security guard and Smalls can be seen going back up to Superior's offices and the security guard used the master security key to let Smalls, Diaz, and her husband into Superior's office based on Smalls' false misrepresentations of his authority to enter the space.

25.     Several minutes later, two unidentified individuals presented themselves to the security guard as "friends and family" of Smalls and they were there to assist the group already in Superior's offices.  These two individuals were also improperly permitted access to Superior's office space based on Smalls' blatant lie to the security guard that he was the President of Superior and was permitted to be in the office.

26.     The group of five people packed up boxes of files and other items and are seen leaving Superior's offices with multiple boxes, walking to the parking garage, and leaving with various boxes of files being placed in different individuals' cars.

27.     Throughout late June and through July 19, 2022, the Superior Defendants unlawfully uploaded client information to MGO's computer systems without the consent of Mr. Benson or the clients. They had no legitimate business reason to undertake such actions against Mr. Benson and Superior without his

consent, except for the obvious fact that they clearly intended to use this proprietary Superior client information to benefit their new employer MGO.

28.    Defendants' criminal and unlawful conduct has severely damaged Superior's business, its ability to service its client and its reputation and goodwill.

## PARTIES

### A.    Plaintiffs

29.    Plaintiff Superior Business Management, Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia. Superior Solutions, Inc. is authorized to conduct business in Georgia.

30.    Plaintiff Superior Tax Solutions, Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia. Superior Solutions, Inc. is authorized to conduct business in Georgia.

31.    Kris Benson is the founder and Chief Executive Officer of both Superior Business Management and Superior Tax Solutions. Mr. Benson has 100% ownership interest in both entities of Superior and resides in Atlanta, Georgia.

### B.    Defendant MGO and Defendant Berg

32.    Upon information and belief, Defendant Macias Gini & O'Connell d/b/a MGO LLP ("MGO") is a California corporation with its principal place of business in California.

33.    Upon information and belief, Defendant MGO India Private Limited is a California corporation with its principal place of business in California.

34.    Danielle Berg is a citizen of the State of Georgia residing in Fulton County and, upon information and belief, can be served with process at 5210 Timber Trail South, Atlanta, Georgia 30042.

35.    MGO, through its President and Chief Experience Officer, Danielle Berg, unlawfully conspired with the Superior Defendants to steal Superior's trade secrets and highly valuable confidential information to facilitate the immediate success of MGO's Atlanta office, a direct competitor of Superior. By conspiring with the Superior Defendants to steal its trade secrets and confidential business information, MGO gained a significant advantage in Atlanta, Georgia, at the expense of, and to the detriment of, Superior and for the benefit of MGO and Smalls partnership with MGO.

36.    In addition to conspiring to steal Superior's trade secrets, MGO, through Berg, President and Chief Experience Officer, unlawfully conspired with Smalls to leverage his knowledge of Superior's clients and personnel to raid Superior's valuable account managers using coercive tactics in a further effort to destroy Superior's business and facilitate the success of MGO's new Atlanta presence.

37.     During June and July 2022, MGO, through Berg, communicated extensively with Smalls and Superior employees using their Superior email addresses and directed Superior employees to provide MGO with proprietary confidential client business and financial information. MGO did not have the authority or consent of Superior's owner Benson to contact Superior employees at work, request that any Superior employee upload Superior's confidential client information to MGO, or request that Benson's employees initiate client transfer requests from Superior to MGO.  MGO, acting through Berg and Smalls, undertook these actions in  clandestine effort to facilitate the transfer thousands of proprietary client files to MGO, without the knowledge or consent of Benson or the Superior clients.

38.     MGO is authorized to transact business in the State of Georgia, and maintains a registered agent for service in Fulton County, Georgia. MGO is a direct competitor of Superior.

39.     This action arises against MGO, because  it has, through Berg and other employees and agents, misappropriated Superior's trade secrets in violation of the federal Defend Trade Secrets Act and the Georgia Trade Secrets Act, violated the Georgia Computer Systems Protection Act through its malicious computer theft and trespass of Superior's computer systems, tortiously interfered with Superior's

contractual relationships with the Superior Defendants and induced the Superior Defendants to breach those contractual obligations to Superior, tortiously interfered with Superior's business relations using Smalls and Superior's accounting employees to stealthily mine proprietary client data and transfer it to MGO, engaged in a civil conspiracy with the Superior Defendants to commit unlawful acts towards Superior and engaged in numerous acts of defamation against Benson and Superior.

40.    Moreover, as the new employer and/or principal of the Superior Defendants, MGO is vicariously and jointly liable for all of the Superior Defendants' unlawful acts against Superior, including but not limited to the Superior Defendants' violations of the Georgia Computer Systems Protection Act, which were taken on behalf and for the benefit of MGO.

### C.    <u>Defendant Tony Smalls</u>

41.    Tony Smalls is a citizen of the State of Georgia and resides in Henry County, GA. Smalls can be served with process at 2008 Pine Forest Ct., Jonesboro, Georgia 30236.

42.    This action arises against Smalls because of Smalls' egregious misappropriation of Superior's trade secrets in violation of the federal Defend Trade Secrets Act and the Georgia Trade Secrets Act, Smalls' computer theft and trespass in violation of the Georgia Computer Systems Protections Act, Smalls' breach of

fiduciary duty and duty of loyalty to Superior and agency relationship with Superior, Smalls' conversion of Superior's proprietary information, Smalls' tortious interference with Superior's contracts with Defendants Diaz, Marrazzo, and Enger and Superior's clients, Smalls' involvement in a civil conspiracy with MGO, Berg, and the Superior Defendants to commit unlawful acts against Superior and its clients, Smalls' fraudulent misrepresentations of having an ownership interest in Superior, and Smalls' slanderous and libelous statement made to third parties regarding Plaintiff Benson and the valuation of Superior's business operations.

### D. **Defendant Melany Diaz**

43.     Diaz is a citizen of the State of Georgia residing in Gwinnett County and, upon information and belief, can be served with process at 2135 Waters Ferry Drive, Lawrenceville, Georgia 30043.

44.     This action arises against Diaz because of Diaz's  egregious misappropriation of Superior's trade secrets in violation of the federal Defend Trade Secrets Act and the Georgia Trade Secrets Act, Diaz's computer theft and trespass in violation of the Georgia Computer Systems Protections  Act, Diaz's breach of duty of loyalty to Superior and agency relationship with Superior, Diaz's breach of her employment contract and restrictive covenants, Diaz's conversion of Superior's proprietary information for her own personal benefit and gain, Diaz's tortious

interference with Superior's employees' contracts with Defendants Marrazzo and Enger, Diaz's involvement in a civil conspiracy with MGO, Berg, and the other Superior Defendants to commit unlawful acts against Superior and its clients, Diaz's breach of the common law duty of loyalty to her employer, and Diaz's slanderous and libelous comments made to third parties regarding Plaintiff Benson and Superior.

### E.    **Defendant Danielle Marrazzo**

45.    Marrazzo is a citizen of the State of Georgia residing in Fulton County and, upon information and belief, can be served with process  at 1101 Juniper St. NE, Apt 805, Atlanta Georgia 30309.

46.    This action arises against Marrazzo because of Marrazzo's misappropriation of Superior's trade secrets in violation of the federal Defend Trade Secrets Act and the Georgia Trade Secrets Act, Marrazzo's computer theft and trespass in violation of the Georgia Computer Systems Protections  Act, Marrazzo's breach of her employment contract and restrictive covenants with Superior, Marrazzo's breach of her duty of loyalty to Superior, Marrazzo's conversion of Superior's proprietary information, Marrazzo's  tortious interference with Superior's business relations, Marrazzo's involvement in a conspiracy with MGO, Berg, and the other Superior Defendants to commit unlawful acts against Superior

and its clients.

**F.      Defendant Natalie Enger**

47.      Enger is a citizen of the State of Georgia and resident of Fulton County.  Enger can be served with process at her residence which is located at 741 Morosogo Drive, NE, Apartment 1458, Atlanta, GA 30324.

48.      This action arises against Enger because of Enger's misappropriation of Superior's trade secrets in violation of the federal Defend Trade Secrets Act and the Georgia Trade Secrets Act, Enger's computer theft and trespass in violation of the Georgia Computer Systems Protections  Act, Enger's breach of her employment contract and restrictive covenants with Superior, Enger's conversion of Superior's proprietary information, Enger's tortious interference with Superior's business contractual relations and  employees' contractual relations, Enger's involvement in a civil conspiracy with MGO, Berg, and the other Superior Defendants to commit unlawful acts against Superior and its clients, and Enger's breach of her duty of loyalty to Superior.

## JURISDICTION AND VENUE

49.      The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 as this action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.*

50.     This Court has personal jurisdiction over the Defendants because they are citizens of the State of Georgia.

51.     Venue is proper in the Northern District of Georgia, Atlanta Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2) and LR 3.1 (B)(1)(a) and (3), NDGA because the cause of action arose in the Atlanta division of the Northern District of Georgia and at least one of the Defendants resides in Fulton County, Georgia, which is part of the Atlanta Division of the Northern District of Georgia.

## FACTUAL ALLEGATIONS

### A.     Superior's Business Operations

52.     Founded in January 2014 by Chief Executive Officer, Kris Benson, Superior is comprised of two arms of services for high-net-worth clients to assist them with daily business management and tax preparation services. Specifically, Superior Business Management provides customized business, lifestyle, and financial advisement services, and Superior Tax Solutions, provides high level tax advisement and preparation for individuals and businesses.

53.     Superior's business development is driven primarily due to Superior's CEO's past experiences and connections as a professional athlete, wherein he gained extensive contacts and first-hand knowledge of professional business management concerning high-net-worth individuals, such as athletes, entertainers, writers, actors,

high-level executives, entrepreneurs, doctors, lawyers, franchises, and businesses.

54.    Superior's customer and prospective customer lists cannot be obtained through publicly available sources.  Superior and its associates and employees expend significant time and resources in cultivating the relationships that generate Superior's revenue.

55.    Between the two arms, Superior is a small company that previously employed seven employees and two independent contractors, one being Smalls, prior to the termination of Smalls, Diaz, Marrazzo and Enger.  Now, with their defection to competitor MGO, Superior has lost 60 percent of its workforce.

56.    Superior undertakes considerable efforts to maintain the secrecy of its clients' proprietary information, including but not limited to, restricting access to the clients' proprietary information only to certain employees, storing clients' proprietary information on secure access cloud based systems, enacting confidentiality policies and having its employees execute employment agreements memorializing their obligations to ensure client confidentiality.

57.    Superior also provides its employees with Company-owned laptops in which to perform services for clients to ensure proper protocols are maintained to store clients' proprietary information as required by state and federal law for tax services and handling of protected financial information.

58.     Superior has an Employee Handbook that applies to all employees and independent contractors throughout their relationship with Superior.  In this regard, Superior has enacted specific provisions and protections for its proprietary information in the Employee Handbook to which Smalls, Diaz, Marrazzo and Enger agreed to abide by.  (See Exhibit 1, Excerpts from Employee Handbook and Exhibit 2, Employee Acknowledgments from Diaz, Marrazzo, and Enger.)

59.     The Employee Handbook contains directives regarding proper and permissible use of Superior's computer systems and associated user accounts. "Section 6-3 Use of Communications and Computer Systems" of the Handbook states as follows:

> Superior Business Management, Inc.'s communication and computer systems are intended primarily for business purposes; however limited personal usage is permitted if it does not hinder performance of job duties **or violate any other SBM policy**. This includes the voice mail, e-mail and Internet systems. Users have no legitimate expectation of privacy in regard to their use of the Superior Business Management, Inc. systems (bold emphasis added).

60.     The Superior's computer systems and associated user account prohibited Smalls, Diaz, Marrazzo and Enger  from engaging in any self-serving activity that violated the company's policies, including the policies to protect confidential data, such as the one explicitly detailed in the Handbook's section, entitled "6-11 Confidential Company Information", which reads as follows:

During the course of work, employees may become aware of confidential information about Superior Business Management, Inc.'s business, including but not limited to information regarding SBM finances, pricing, products and new product development, software and computer programs, marketing strategies, suppliers and customers and potential customers. Employees also may become aware of similar confidential information belonging to the SBM's clients. **It is extremely important that all such information remain confidential, and particularly <u>not be disclosed to Superior Business Management, Inc.'s competitors</u>.** Any employee who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of the SBM may be subject to disciplinary action up to and including termination. Employees may be required to sign an agreement reiterating these obligations (bold emphasis added).

61.    All of the Superior Defendants' self-serving actions were a blatant exploitation of Superior's computer systems designed to benefit their new employer, MGO.  Consequently, such bad-faith conduct is a direct violation of Superior's Handbook's computer usage and confidential information policies.

## B.    <u>Smalls' Business Relationship with Superior as a Managing Director</u>

62.    Smalls began working with Superior in 2016 as a Managing Director. Prior to his association with Superior, he was employed with Deloitte & Touche, LLP in the Audit Practice and as a Senior Consultant in the Management Solutions and Services Practice, where he managed  entertainment artists. Smalls is a Partner with MGO currently.

63.     Superior associated with Smalls to expand its management of entertainment artists in Superior's operations and Superior relied on Smalls' contacts and reputation in the entertainment industry to expand Superior's business in the entertainment industry.

64.     In his role as Managing Director, Smalls was a senior team member but did not hold any ownership interest in Superior.  Smalls was involved in developing and managing entertainment clients for Superior Business Management. Smalls was associated with Superior as an independent contractor and was paid commissions on the work he performed for Superior.

65.     Smalls was required to comply with Superior's confidentiality and client information protection policies and he had a duty of loyalty to Superior not to engage in any business practices that would harm any of Superior's business relationships or its relationships with its employees.

**C.     Diaz's Employment with Superior**

66.     Diaz began working for Superior Business Management, Inc. on January 29, 2018 as an Executive Account Manager and Tax Compliance Officer. In her position, Diaz performed, amongst other tasks, daily bookkeeping and accounting tasks for the client accounts assigned to her, was the primary  point of contact for client accounts assigned to her, and used her tax knowledge and training

to assist in the Company's tax processes and procedures.

67.     In addition, as a condition of Diaz' employment at Superior, Diaz entered into an Employment Agreement with Superior dated January 29, 2018. (Exhibit 3, Diaz Employment Agreement).

68.     In her Agreement, Diaz specifically agreed to comply with the following obligations regarding no conflict of interest, confidentiality and non-solicitation of customers and employees, both during and after her employment at Superior as follows:

 1.1 Employee shall conduct herself at all times in a business-like and professional manner as appropriate for a person in her position and shall represent the Company in all respects which are in compliance with good business and ethical practices. Furthermore, Employee shall be subject to and strictly abide by the policies and procedures of the Company applicable to personnel of the Company as adopted or amended from time to time.

 1.2 Employee shall devote her full business efforts and time to the Company and its affiliates (including other companies and entities that are partially or wholly (i) owned by or (ii) under common control or ownership with the Company) and **Employee shall not render services to any other business while she is employed by the Company pursuant to this Agreement.** Employee shall provide the Company with all information, suggestions and recommendations Employee conceives or learns regarding the Company's business that could be of benefit to the Company. **Employee shall refrain from any activity or action that creates a conflict of interest with the Company or reasonably could be expected to have a material detrimental effect on the**

**Company.**

6.1 <u>Non-Solicitation of Customers</u>. As long as Employee is employed by the Company and for a period of twelve (12) consecutive calendar months following the termination of employment, for any reason whatsoever…Employee will not, directly or indirectly, either for herself or any other person, contact, call upon, solicit, divert, appropriate or take away (or attempt to contact, call upon, solicit, divert, appropriate or take away) with the intent of doing business with any of the current or prospective clients or customers of the Company, or any client or customer that the Company previously rendered service to or from whom the Company received revenue of any kind within the six (6) months preceding the Employee's termination of employment (hereinafter "<u>Company Clients</u>") with whom Employee had Material Contact within twelve (12) months prior to the termination of Employee's employment, including prospects of the Company with whom Employee had contact during said period, if the purpose of such activity is either (i) to solicit such Company Clients for a Competitive Business (as defined herein below) including, but not limited to, any Competitive Business started by Employee or (ii) to otherwise encourage any such customer or client to discontinue, reduce, or adversely alter the amount of its business with the Company.

Employee acknowledges that due to Employee's relationship with the Company, Employee will obtain access and information relating to Company Clients, and that it would be unfair and harmful to the Company if Employee took advantage of these relationships in a Competitive Business. With regard to the Company's Clients, "<u>Material Contact</u>" shall exist if Employee (a) interacted with the Company's Clients regarding the Company's Business or (b) received compensation as a result of Employee's interaction with the Company's Client, relating to the Company's Business.

"Competitive Business" is an enterprise that offers services and/or products substantially similar to those products and services offered by the Company or to the Company's Clients.

6.2  <u>Non-Solicitation of Employees or Independent Contractors</u>. Employee will not, directly or indirectly, either for herself or any other person (i) solicit, recruit or hire (or attempt to solicit, recruit or hire) or otherwise assist anyone in soliciting, recruiting or hiring any employee or independent contractor of the Company who performed work for the Company within the last twelve (12) months of Employee's employment with the Company or who was otherwise engaged or employed with the Company at the time of termination of Employee's employment with the Company, and with whom Employee had Material Contact. With regard to employees or independent contractors, "<u>Material Contact</u>" shall exist if Employee (a) supervised the person or was supervised by the person directly or indirectly; or (b) if Employee worked with or interacted with the person with regard to the Company's Business.

6.3  <u>Confidentiality Agreement</u>. Employee recognizes that upon execution of this Agreement and from time to time during the course of her employment with the Company, Employee may receive information from or regarding the Company or the Company's Clients, their family members, friends, employees, agents, business associates or other representatives relating thereto in the nature of Trade Secrets or other confidential or proprietary business information, including, without limitation, any files, records, policies, plans, documents, programs, concepts, client lists, referral source lists, client lists methods, techniques, devises, compilations, pricing information, financial data, financial plans, or development data of the Company, or any other confidential information concerning the business, customers,

clients, former or current employees, methods, operations, financing or services of the Company, the release of which may be damaging to Company or Persons with which it does business (the **"Confidential Information"**). Employee agrees that except as expressly permitted under this Agreement, Employee will not at any time during the Restricted Period (and in the case of Trade Secrets, for so long as such information remains a Trade Secret) divulge any such Confidential Information to any third party for any reason or use such Confidential Information for any purpose without the prior written consent of Company. All Confidential Information or other materials furnished by the Company or the Company's Clients to Employee **shall remain the property of the Company** (including any copies) and shall be returned to the Company promptly when Employee's employment with the Company ends. As used herein, the term "Trade Secrets" shall have the meaning set forth in the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, *et. seq.,* as amended or as otherwise defined by Georgia law.

69.     On March 17, 2022, Diaz received a base salary increase for her efforts "to better [Superior and its clients]."

70.     On or about June 15, 2022 through July 19, 2022, Diaz worked with Berg and Smalls to recruit Superior employees to join MGO and continues to misappropriate Superior's clients' information for MGO's benefit in blatant violation of her Employment Agreement and Superior's policies.   Diaz was terminated on July 14, 2022, but has continued to maliciously and unlawfully access Superior's computer systems without any authorization as recently as July 19, 2022.

71.     On or about June 26, 2022, Diaz accepted an offer of employment from MGO.

72.     Diaz then, surreptitiously and without the knowledge or consent of Benson created a private Microsoft Teams email group in the Superior database called "MGO Transition" which only she, Smalls, Enger, and Marrazzo could see and use. Hidden Superior email addresses were also set up for the team to communicate with each other and transfer information to and from each other that no other employees of Superior or Benson were aware of.  (See Exhibit 4, Private Microsoft Teams Group Created.)

73.     The Superior Defendants referred to the MGO transition as "Project Outkast" and Smalls held weekly meetings with his new "team" at  MGO during working hours of Superior and at Superior's offices regarding Smalls' "team's" move to MGO.  (See Exhibit 5, Project Outcast Meeting; See Exhibit 6, Project Outkast Weekly Status Meeting Agenda.)

74.     On July 1, 2022, Enger was added to the secret "Project Outkast" Teams group.

75.     On July 7, 2022, Diaz forwarded a reminder for herself from her personal email to her Superior email to complete tasks related to moving Superior information over to MGO.

76.     Diaz reported to Benson, Smalls, and Gary Clayton throughout her employment until she was terminated on July 14, 2022.  Diaz was terminated for misappropriation of client proprietary information in violation of her Employment Agreement, the Employee Handbook, and applicable law.

77.     At some point between July 16-18, 2022, Diaz entered Superior's offices without permission.   Somehow Diaz convinced security in Superior's building to allow her to enter Superior's office since her access card no longer worked.  Diaz then proceeded to enter Superior's offices without permission and removed multiple boxes of client files that she had no legal authority to remove.

78.      In addition, between July 15-19, 2022, Diaz accessed Superior's computer systems, email accounts, and financial systems where she downloaded additional proprietary information, changed bank account information, sent emails, and deleted proprietary information and intentionally and unlawfully sabotaged Superior's computer systems while she was employed by MGO.

### D.    Marrazzo's Employment with Superior

79.     Marrazzo began working for Superior Business Management, Inc. on or about February 8, 2021 as a Senior Accountant.

80.      In her role, Marrazzo worked directly with clients and completed

client work product while assisting junior staff.

81.     As a condition of Marrazzo's employment at Superior, Marrazzo entered into an Employment Agreement with Superior executed March 19, 2021. (See Exhibit 7, Marrazzo Employment Agreement).

82.     In her Agreement, Marrazzo agreed specifically to the following provisions detailed below regarding confidentiality and non-solicitation of customers and employees, both during and after her employment at Superior.

II.    Responsibilities:

Employee shall conduct herself at all times in a business-like and professional manner as appropriate for a person in her position and shall represent the Company in all respects which are in compliance with good business and ethical practices. Furthermore, Employee shall be subject to and strictly abide by the policies and procedures of the Company applicable to personnel of the Company as adopted or amended from time to time.

Employee shall devote her full business efforts and time to the Company and its affiliates (including other companies and entities that are partially or wholly (i) owned by or (ii) under common control or ownership with the Company) and **Employee shall not render services to any other business while she is employed by the Company pursuant to this Agreement.** Employee shall provide the Company with all information, suggestions and recommendations Employee conceives or learns regarding the Company's business that could be of benefit to the Company. **Employee shall refrain from any activity or action that creates a conflict of interest with the Company or reasonably could be expected to have**

**<u>a material detrimental effect on the Company.</u>**

XIII.     <u>Restrictive Covenants</u>:

<u>Non-Solicitation of Customers.</u> As long as Employee is employed by the Employer and for a period of twelve (12) consecutive calendar months following the termination of employment, for any reason whatsoever…Employee will not, directly or indirectly, either for herself or any other person, contact, call upon, solicit, divert, appropriate or take away (or attempt to contact, call upon, solicit, divert, appropriate or take away) with the intent of doing business with any of the current or prospective clients or customers of the Employer, or any client or customer that the Employer previously rendered service to or from whom the Employer received revenue of any kind within the six (6) months preceding the Employee's termination of employment (hereinafter "Employer's Clients") with whom Employee had Material Contact within twelve (12) months prior to the termination of Employee's employment, including prospects of the Employer with whom Employee had contact during said period, if the purpose of such activity is either (i) to solicit such Employer Clients for a Competitive Business (as defined herein below) including, but not limited to, any Competitive Business started by Employee or (ii) to otherwise encourage any such customer or client to discontinue, reduce, or adversely alter the amount of its business with the Employer.

Employee acknowledges that due to Employee's relationship with the Employer, Employee will obtain access and information relating to Employer's Clients, and that it would be unfair and harmful to the Employer if Employee took advantage of these relationships in a Competitive Business. With regard to the Employer's Clients, "Material Contact" shall exist if Employee (a) interacted with the Company's Clients regarding the

Employer's Business or (b) received compensation as a result of Employee's interaction with the Employer's Client, relating to the Employer's Business.

"Competitive Business" is an enterprise that offers services and/or products substantially similar to those products and services offered by the Employer or to the Employer's Clients.

<u>Non-Solicitation of Employees or Independent Contractors.</u> Employee will not, directly or indirectly, either for herself or any other person (i) solicit, recruit or hire (or attempt to solicit, recruit or hire) or otherwise assist anyone in soliciting, recruiting or hiring any employee or independent contractor of the Employer who performed work for the Company within the last twelve (12) months of Employee's employment with the Employer or who was otherwise engaged or employed with the Employer at the time of termination of Employee's employment with the Employer, and with whom Employee had Material Contact. With regard to employees or independent contractors, "Material Contact" shall exist if Employee (a) supervised the person or was supervised by the person directly or indirectly; or (b) if Employee worked with or interacted with the person with regard to the Employer's

Business.

XI.        <u>Confidentiality:</u>

Employee recognizes that upon execution of this Agreement and from time to time during the course of her employment with the Employer, Employee may receive information from or regarding the Employer or the Employer's Clients, their family members, friends, employees, agents, business associates or other

representatives relating thereto in the nature of Trade Secrets or other confidential or proprietary business information, including, without limitation, any files, records, policies, plans, documents, programs, concepts, client lists, referral source lists, client lists methods, techniques, devises, compilations, pricing information, financial data, financial plans, or development data of the Employer, or any other confidential information concerning the business, customers, clients, former or current employees, methods, operations, financing or services of the Employer, the release of which may be damaging to Employer or Persons with which it does business (the "Confidential Information"). Employee agrees that except as expressly permitted under this Agreement, Employee will not at any time during the Restricted Period (and in the case of Trade Secrets, for so long as such information remains a Trade Secret) divulge any such Confidential Information to any third party for any reason or use such Confidential Information for any purpose without the prior written consent of Company. All Confidential Information or other materials furnished by the Employer or the Employer's Clients to Employee shall remain the property of the Employer (including any copies) and shall be returned to the Employer promptly when Employee's employment with the Employer ends. As used herein, the term "Trade Secrets" shall have the meaning set forth in the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, *et. seq.,* as amended or as otherwise defined by Georgia law.

83.     On or about June 15, 2022 through her final day of employment, Marrazzo worked with Berg, Diaz and Smalls to misappropriate Superior's clients' information for MGO's benefit, in blatant violation of her Employment Agreement and Superior's policies.

84.     On or about June 26, 2022, Marrazzo accepted an offer of employment from MGO.

85.     Marrazzo reported to Benson, Smalls, and Gary Clayton throughout her employment until she was terminated on July 14, 2022. Marrazzo was terminated for misappropriation of client proprietary information in violation of her Employment Agreement, the Employee Handbook, and applicable law.

**E.     Enger's Employment with Superior**

86.     Enger began working for Superior Business Management, Inc. on or about September 7, 2021 as a Senior Accountant.

87.     In her role, Enger worked directly with clients and has access to their proprietary client information. Enger was subject to Superior's Employee Handbook.

88.     As a condition of Enger's employment at Superior, Enger entered into an Employment Agreement with Superior that was executed September 7, 2021 (See Exhibit 8, Enger Employment Agreement.)

89.     In her Agreement, Enger agreed specifically to the following provisions detailed below regarding confidentiality and non-solicitation of customers and employees, both during and after her employment at Superior.

II.     Responsibilities:

Employee shall conduct herself at all times in a business-like and professional manner as appropriate for a person in her position and shall represent the Company in all respects which are in compliance with good business and ethical practices. Furthermore, Employee shall be subject to and strictly abide by the policies and procedures of the Company applicable to personnel of the Company as adopted or amended from time to time.

Employee shall devote her full business efforts and time to the Company and its affiliates (including other companies and entities that are partially or wholly (i) owned by or (ii) under common control or ownership with the Company) and **Employee shall not render services to any other business while she is employed by the Company pursuant to this Agreement.** Employee shall provide the Company with all information, suggestions and recommendations Employee conceives or learns regarding the Company's business that could be of benefit to the Company. **Employee shall refrain from any activity or action that creates a conflict of interest with the Company or reasonably could be expected to have a material detrimental effect on the Company.**

XIII.    <u>Restrictive Covenants:</u>

<u>Non-Solicitation of Customers.</u> As long as Employee is employed by the Employer and for a period of twelve (12) consecutive calendar months following the termination of employment, for any reason whatsoever…Employee will not, directly or indirectly, either for herself or any other person, contact, call upon, solicit, divert, appropriate or take away (or attempt to contact, call upon, solicit, divert, appropriate or take away) with the intent of doing business with any of the current or prospective clients or customers of the Employer, or any client or customer that the Employer previously rendered service to or from whom the Employer received revenue of any kind within

the six (6) months preceding the Employee's termination of employment (hereinafter "Employer's Clients") with whom Employee had Material Contact within twelve (12) months prior to the termination of Employee's employment, including prospects of the Employer with whom Employee had contact during said period, if the purpose of such activity is either (i) to solicit such Employer Clients for a Competitive Business (as defined herein below) including, but not limited to, any Competitive Business started by Employee or (ii) to otherwise encourage any such customer or client to discontinue, reduce, or adversely alter the amount of its business with the Employer.

Employee acknowledges that due to Employee's relationship with the Employer, Employee will obtain access and information relating to Employer's Clients, and that it would be unfair and harmful to the Employer if Employee took advantage of these relationships in a Competitive Business. With regard to the Employer's Clients, "Material Contact" shall exist if Employee (a) interacted with the Company's Clients regarding the Employer's Business or (b) received compensation as a result of Employee's interaction with the Employer's Client, relating to the Employer's Business.

"Competitive Business" is an enterprise that offers services and/or products substantially similar to those products and services offered by the Employer or to the Employer's Clients.

Non-Solicitation of Employees or Independent Contractors. Employee will not, directly or indirectly, either for herself or any other person (i) solicit, recruit or hire (or attempt to solicit, recruit or hire) or otherwise assist anyone in soliciting, recruiting or hiring any employee or independent contractor of the Employer who performed work for the Company within the last twelve

(12) months of Employee's employment with the Employer or who was otherwise engaged or employed with the Employer at the time of termination of Employee's employment with the Employer, and with whom Employee had Material Contact. With regard to employees or independent contractors, "Material Contact" shall exist if Employee (a) supervised the person or was supervised by the person directly or indirectly; or (b) if Employee worked with or interacted with the person with regard to the Employer's Business.

XI.        <u>Confidentiality</u>:

Employee recognizes that upon execution of this Agreement and from time to time during the course of her employment with the Employer, Employee may receive information from or regarding the Employer or the Employer's Clients, their family members, friends, employees, agents, business associates or other representatives relating thereto in the nature of Trade Secrets or other confidential or proprietary business information, including, without limitation, any files, records, policies, plans, documents, programs, concepts, client lists, referral source lists, client lists methods, techniques, devises, compilations, pricing information, financial data, financial plans, or development data of the Employer, or any other confidential information concerning the business, customers, clients, former or current employees, methods, operations, financing or services of the Employer, the release of which may be damaging to Employer or Persons with which it does business (the "Confidential Information"). Employee agrees that except as expressly permitted under this Agreement, Employee will not at any time during the Restricted Period (and in the case of Trade Secrets, for so long as such information remains a Trade Secret) divulge any such Confidential Information to any third party for any reason or use such Confidential Information for any

purpose without the prior written consent of Company. All Confidential Information or other materials furnished by the Employer or the Employer's Clients to Employee shall remain the property of the Employer (including any copies) and shall be returned to the Employer promptly when Employee's employment with the Employer ends. As used herein, the term "Trade Secrets" shall have the meaning set forth in the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760, *et. seq.,* as amended or as otherwise defined by Georgia law.

90.    On or about June 26, 2022, Enger accepted an offer of employment from MGO reporting to Smalls.  On July 1, 2022, Enger was added to Project Outkast by Defendant Diaz, the covert Microsoft Teams Group formed by Defendant Diaz for the Superior Defendants to transfer proprietary information to MGO without the knowledge or consent of Benson.

91.    On or about July 1, 2022 through her final day of employment on July 18, 2022, Enger worked with Berg, Diaz and Smalls to misappropriate Superior's clients' information for MGO's benefit, in blatant violation of her Employment Agreement and Superior's policies.

F.    **Berg and Smalls Orchestrate the Move to MGO Atlanta Using Clandesitine and Unlawful Tactics that Include Theft of Proprietary Information, Computer Trespass, Fraudulent Misrepresentations, Defamation, and Tortious Interference with Superior's Employees and Clients**

92.    In March of 2022, Smalls allegedly began discussions with MGO for a merger between Superior and MGO, despite his lack of authority to do so.

93.     Benson, as Superior's sole owner and CEO, attempted to speak with MGO on multiple occasions, but Kevin O'Connell and Berg did not make any meaningful attempts to engage in a dialogue with Benson.

94.     While Superior's CEO attempted to speak with MGO under the impression that Smalls was advocating on behalf of Superior, Smalls maliciously capitalized on the MGO opportunity and turned it into a lucrative Partner position with MGO for himself, based on porting the majority of Superior's business and tax clients and critical account personnel.

95.     On April 1, 2022, Smalls was provided with Confidential Information containing Superior's Account Manager Master List ("Master List") for business management clients (not tax clients) and their fee structure that Benson had permitted Smalls to disclose to Berg and MGO in an effort to undertake discussions with MGO about the potential purchasing of Superior. Benson consented only to the disclosure of limited business side information to MGO via Smalls in an effort to evaluate whether or not MGO and Superior could reach an agreement to acquire Superior. At no point did Benson consent to Smalls sharing any other information, including tax client information with MGO.

96.     It is unclear what exactly Smalls emailed to Berg at MGO during this time period, but Smalls undoubtedly sent MGO and Berg much more detailed client

information than Benson had agreed to allow to be transmitted to MGO, including extensive tax client information, including monthly retainer amounts and hourly rates.

97.    On April 1, 2022, after receiving confirmation of receipt of the list from Berg, Berg emailed Smalls and requested an updated client list with fees as well as "[n]ames/roles of team members that would come over[.]" (See Exhibit 9, April 1, 2022 email exchange between Berg and Smalls.)

98.    On April 15, 2022, Berg emailed Smalls requesting additional confidential information, including: Superior's financial statements, profit and loss statements, and Superior's space and office layout. Berg also invited Smalls to meet at MGO's Walnut Creek Office in California on April 18, 2022. (See Exhibit 10, April 15, 2022 email exchange between Berg and Smalls.)

99.    Two days prior to the meeting, log file data shows Smalls accessed Superior's ShareFile network to access data in preparation for the meeting  that was not in the usual course and scope of his job duties.

100.    Review of log files and email interactions on Superior secure devices indicates that Smalls kept in constant communication with MGO and Berg, without ever updating Plaintiff Benson as to the status of his interactions with MGO.

101.    On May 12, 2022, Smalls received an offer letter from MGO,

providing for a start date of May 31, 2022 and requesting documents such as a Buy/Sell Agreement. (See Exhibit 11, May 12, 2022 email exchange with Smalls and Berg regarding partnership offer.)

102.    On June 20, 2022, MGO personnel emailed Smalls at his Superior email address and notified Smalls that his employment would commence on July 1, 2022 and that critical information needed to be returned "so [MGO] can plan for [**Tony's team's**] transition." (See Exhibit 12,  June 20, 2022 email exchange between Penny Auterson with Smalls.)

103.    On June 2, 2022, Berg sent Smalls Superior's client list prior to attending a "private" lunch meeting with Smalls, Diaz and Marrazzo in Atlanta, GA. Benson had no knowledge of this meeting and was not invited to this meeting and neither Smalls, Diaz or Marrazzo let their boss, Benson, know that they were meeting Berg for lunch on June 2, 2022. (See Exhibit 13, May 31, 2022 email exchange between Berg and Smalls confirming "private" lunch meeting.)

104.    MGO's HR department emailed Smalls on June 13, 2022 for "the benefits census needed for **Tony's employees.**" (See Exhibit 14, June 13, 2022 email exchange between Pon and Smalls.)

105.    Throughout June 2022, while Smalls, Diaz, Marrazzo, and Enger were providing MGO with Superior's proprietary information, Smalls continued to lie to

Benson and Gary Clayton regarding his status of discussions with MGO.  Further, during June 2022, Smalls never told Benson there really was going to be no deal between Superior and MGO because the reality was Smalls had accepted a partnership position with MGO and was planning to take the majority of Benson's clients with him, and that MGO was also making job offers to a large percentage of his accounting staff.

106.    On June 9, 2022, **one month** after  Smalls accepted a partner position with MGO, Benson and Berg spoke for the first time.  Despite Benson's prior unsuccessful attempts to connect with Berg and MGO's Kevin O'Connell to find out the status of communications between Smalls and MGO on behalf of Superior, Berg intentionally ignored Benson's overtures repeatedly and made frivolous excuses for not returning his calls or responding to his emails.

107.    Indeed, when they did connect, on June 9, 2022, Berg had already executed her plan of securing Smalls as a Partner in Atlanta, GA, shored up the book of business management and tax clients Smalls would take from Superior and bring to MGO, and began the process to hire Benson's key accounting staff. Ironically, during this call with Benson, the actual owner of Superior, Berg failed to share any of these critical plans for the future of Benson's business and employees.

108.    After the video call, Berg emailed an offer to Superior's CEO that did

not resemble an acquisition or an offer of employment to Superior's CEO to join MGO as an employee. (See Exhibit 15, June 29, 2022 email exchanges with Berg and Benson regarding MGO offer to Benson.)

109.    Only a few days later, on June 13, 2022, Smalls and MGO exchanged redlined versions of Small's offer letter and the Buy/Sell Agreement through Superior's email systems. (See Exhibit 16, June 13, 2022 email exchange with MGO HR and Smalls regarding MGO Offer Letter.)

110.    The Offer Letter that was discovered on Superior's computer systems includes a client list that Smalls intended to port out of Superior to MGO, totaling approximately $1.5 million in annual anticipated revenue, as well as identifying the Superior employees, including Diaz and Marrazzo, that would follow Smalls to MGO and comprise his team.  (See Exhibit 17, 7.1.22 Smalls Offer Letter.)

111.    Smalls continued his efforts to transfer Superior's clients' proprietary information to MGO, all the while blatantly lying to Benson to buy himself time to steal the clients and staff he needed to be successful at MGO.  Indeed, during a call between Smalls, Gary Clayton and Benson, on June 14, 2022, Smalls falsely represented that he "had not made a decision to join MGO" yet to both Benson and Clayton. (See Exhibit 17, June 13, 2022 email exchange between Smalls and Wong.)

112.    The very next day, on June 15, 2022, Smalls executed his offer letter

with MGO to join MGO as a Partner and continued in his quest to transition the majority of Superior's clients to MGO and employees to work for him directly at MGO. (See Exhibit 19, June 15, 2022  executed MGO Buy-Sell Agreement and Exhibit 20, June 15, 2022 proof of executed Smalls MGO Income Partner Agreement.)

113.    MGO and Smalls continued to target and recruit Superior's employees, including Diaz, Marrazzo, Enger and Cronin for employment with MGO. (See Exhibit 21, June 16, 2022 email exchange between Smalls and Grizzle at MGO Finance; Exhibit 22, June 17, 2021 email exchange with Smalls regarding Benefits Overview Email.).

114.    On June 20, 2022, Diaz and MGO exchanged emails regarding Diaz's offer letter from MGO. (See Exhibit 23, June 20, 2022 email exchange between Auterson and Diaz regarding position with MGO.)

115.    After Diaz proposed additional questions regarding her commissions under her agreements with Superior on June 22, 2022 MGO responded that "[a]ny current agreements with Superior will end[.]" (See Exhibit 24, June 25, 2022 email regarding Diaz MGO Offer.)

116.    Between June 22 and June 29, 2022 a barrage of communications between Smalls, Diaz and MGO personnel went through Superior's computer

systems, without the knowledge or consent of Benson, regarding setting up Superior's clients and other data in MGO's systems, as well as sending new engagement letters to Superior's clients.  (See Exhibit 25, June 27, 2022 MGO IT Video Call Scheduled; Exhibit 26, June 27, 2022 Diaz email to Back Office, Exhibit 27, June 23, 2022 email exchange with Diaz and Smalls to transfer Client Details; Exhibit 28, June 23, 2022 email attaching MGO Client Transition Email Templates; Exhibit 29, June 23, 2022 MGO email exchange forwarding information from MGO, via Diaz, to Enger, and Exhibit 30, June 27, 2022 email exchange Gonzalez to Smalls sending templates.)

117.    On June 29, 2022, Superior's CEO proposed a counteroffer to Berg wherein he advised that any clients that could potentially be moved to MGO, would be at his discretion and he would receive fair compensation for transferring the business to MGO.  Not surprisingly, Berg rejected Benson's counteroffer on July 1, 2022 as she had no need for Benson at MGO.

118.    On July 1, 2022, Smalls and Diaz created a secret Team account for the Superior Defendants to utilize to upload client information directly to MGO. (See Exhibit 31, July 1, 2022 email exchange supplying template MGO Engagement Letter for the Superior Defendants to transmit to Superior clients.)

119.    MGO and Smalls crafted press releases and biographies for use on

MGO's website, as well as set up Microsoft teams calls with Superior's staff. (See Exhibit 32, July 1, 2022 emails attaching draft Smalls Press Release and Bio.)  All of this was done while Smalls, Diaz, Marrazzo and Enger were supposed to be working for Superior and using Superior's computer systems to service Superior's clients.

120.    On July 1, 2022, Diaz received an MGO laptop, despite still being employed with Superior.

121.    Smalls, Diaz, Marrazzo, and Enger were downloading massive amounts of Superior's client information and providing it to MGO, as well as preparing notifications to go to Superior's clients of MGO taking over all the while working for Superior on Superior's computer systems.  (See Exhibit 33, July 5, 2022 MGO Transitioning Email.)

122.    On July 5, 2022, Diaz and Benson exchanged emails in which Benson specifically told Diaz there had been no decision on MGO and Diaz failed to mention she had already accepted a position with MGO and was preparing to leave Superior, set up a secret Teams group on July 1, 2022 for the benefit of MGO and her new supervisor Smalls and had received her MGO laptop.

123.     On July 6 and 9, 2022, Diaz directed Marrazzo and Enger  to update their client's information into an MGO schedule requesting client details and they

did so at her directive and provided their client specific information to MGO. Again, this conduct occurred while they were supposed to be working for and on behalf of Superior and used Superior's computer systems for the benefit of MGO.

124.    MGO, Smalls, and Berg all conspired in bringing Superior clients over to MGO "without disruption." (See Exhibit 34, July 9, 2022 email exchange regarding Berg and Smalls.)

125.    Smalls, Marrazzo and Diaz were terminated from Superior on July 14 and 15, 2022 respectively after Superior conducted an investigation into unusual file activity.

126.    Enger resigned from Superior to join MGO on July 18, 2022.

127.    Now, armed with their detailed knowledge of Superior's Confidential Information, Smalls, Diaz, Marrazzo and Enger are actively soliciting Superior clients — clients whose identities they would never have even known but for the confidential information shared with them during their employment with Superior, causing these clients to end their relationships with Superior and retain MGO.

128.    These actions threaten disastrous consequences for Superior, with the potential to decimate its customer base and revenue.

129.    Therefore, to preserve the status quo, and prevent the deliberate destruction of its business, Superior now seeks immediate injunctive relief: (1)

enjoining MGO, Berg, Smalls, Diaz, Marrazzo, and Enger and all persons acting in concert with or through them, who receive actual notice of the injunction, from disclosing or using Superior Confidential Information; (2) enjoining Defendants Smalls, Diaz, Marrazzo and Enger from breaching their confidentiality obligations contained in their respective Employment Agreements with Superior; (3) enjoining Diaz, Marrazzo and Enger from breaching their non-solicitation of customers covenants contained in their respective Employment Agreements with Superior with respect to all Superior customers and potential future customers; and (4) enjoining Defendant Smalls, and all persons acting in concert with or through him, who receive actual notice of the injunction, from tortiously interfering with Diaz's, Marrazzo's, and Enger's contracts with Superior and with any other Superior employees' contracts with Superior.

## COUNT ONE
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. 1836 ET SEQ. (AGAINST ALL DEFENDANTS)

130.     Superior repeats and realleges paragraphs 1-129 as if fully set forth herein.

131.     Superior possesses trade secrets including Superior's current and potential future client lists.

132.    The trade secrets give Superior a significant advantage over its competitors, an advantage that would be lost if such trade secrets became known to Superior's competitors.

133.    The trade secrets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

134.    Superior has made reasonable efforts under the circumstances to protect the confidentiality of its trade secrets, including designating certain information as confidential, requiring employees to sign confidentiality agreements, restricting access to such information, safeguarding such information with encryptions, and providing Company-issued computers and mobile phone technology to employees to ensure that Superior confidential information remains on Superior devices and networks.

135.    Defendants had knowledge of, and access to, Superior's trade secrets.

136.    Defendants were and remain under a duty to keep Superior's trade secrets confidential and not to use, exploit or divulge such information other than for the benefit of Superior and with its authorization.

137.    Defendants misappropriated Superior's trade secrets for their own gain, without regard to Superior's rights, and without compensation, permission, or

license from Superior.

138.    Defendants' conduct was and remains willful and wanton, in bad faith and with blatant disregard for Superior's valid and enforceable rights.

139.    Defendants still possess Superior's trade secrets.

140.    As a result of Defendants' conduct, Superior has been, and is still being, damaged in an amount to be determined at trial.

141.    Superior has suffered irreparable harm as a result of Defendants' conduct and will continue to suffer irreparable harm that cannot be adequately redressed at law, unless they are enjoined from engaging in any such further conduct.

<u>**COUNT TWO**</u>
<u>**MISAPPROPRIATION OF TRADE SECRETS (AGAINST ALL DEFENDANTS)**</u>

142.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-141 above, as if set forth in full herein.

143.    During and by virtue of their employment with Superior, the Superior Defendants were provided access to and did, in fact, receive and review Superior's trade secret information, documents, and materials, including (but not limited to) information concerning Superior's clients and their businesses. Such trade secret information has been assembled and compiled by Superior at considerable expense, is maintained in confidence, and is of considerable economic value because it is not

available to Superior's  competitors. Such trade secrets are treated by Superior as confidential and are not publicly available to its competitors.

144.    Superior has made and continues to make reasonable efforts to maintain the secrecy of the trade secret information Defendants have misappropriated.

145.    The information and property described in the preceding paragraphs consist in whole or in part of trade secret information and materials as defined by the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 *et seq*.

146.    Defendants obtained Superior's trade secret information, documents, and material by improper means, including the exploitation of Superior Defendants' positions of trust with Superior, fraud, deceit, theft, and violation of the Georgia Computer Systems Protection Act.

147.    MGO, Berg, and the Superior Defendants have misappropriated Superior's trade secret information and materials for their own unlawful use to the detriment of Superior.

148.    As a result of Defendants' misappropriation and unlawful use of Superior's trade secrets, Superior has suffered damages in the form of actual losses caused by the misappropriation, including (but not limited to) lost profits, loss of competitive advantage, and the diminution and destruction of the value of its trade

secrets. Furthermore, Defendants have been unjustly enriched as a result of their misappropriation.

149.    Defendants' misappropriation and unlawful use of Superior's trade secret information was willful and malicious, thus entitling Superior to an award of attorneys' fees and exemplary damages pursuant to O.C.G.A. § 10-l-763(b).

150.    Defendants' misappropriation and unlawful use of Superior's  trade secrets has caused and will continue to cause Superior irreparable harm for which there is no adequate remedy at law so as to warrant an immediate temporary restraining order as well as a preliminary and permanent injunction.

## COUNT THREE
## BREACH OF DUTY OF LOYALTY (AGAINST THE SUPERIOR DEFENDANTS)

151.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-150 above, as if set forth in full herein.

152.    As employees of Superior, who had access to Superior's valuable trade secrets and confidential information, and who were in a position of trust, the Superior Defendants owed Superior a duty of loyalty which required them, among other things, to devote their full-time efforts to Superior's best interests and to not engage in activities that would injure Superior.

153.    The Superior Defendants, while still employed by Superior, breached

their duty of loyalty by (among other things) misappropriating Superior's  trade secrets, as well as other property that belongs to Superior in an effort to maximize their ability to develop a competitive business for MGO following their resignation from Superior.

154.    Superior's customer relations and other business relations have been damaged as a direct and proximate result of the Superior Defendants' breach of their duty of loyalty.

155.    The Superior Defendants' breach of their duty of loyalty was willful and malicious, thus entitling Superior to an award of punitive or exemplary damages.

156.    Superior has suffered, and will continue to suffer, irreparable harm so as to warrant an immediate temporary restraining order, as well as a preliminary and permanent injunction against the Superior Defendants. Absent such equitable relief, the Court will not be able to make Superior whole.

<u>**COUNT FOUR**</u>
<u>**BREACH OF AGENCY RELATIONSHIP (AGAINST THE SUPERIOR DEFENDANTS)**</u>

157.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-156 above, as if set forth in full herein.

158.    As employees and associates of Superior, the Superior Defendants were agents of Superior and owed a duty of loyalty and good faith to Superior, as

their principal. The Superior Defendants had a duty not to make a personal profit (to Superior's detriment) from the knowledge obtained from their agency relationship with Superior.

159.    The Superior Defendants, while still employed and associated with Superior, breached their agency relationships by (among other things): (a) misappropriating Superior's trade secrets, as well as other property that belongs to Superior; and (c) soliciting Superior's employees to work for a competing business.

160.    The Superior Defendants violated their duties by misusing their agency relationships for their personal gain and the gain of MGO in violation of O.C.G.A. § 10-6-25 et seq.

161.    Superior's customer relations and employee relations have been damaged as a direct and proximate result of the Superior Defendants' breaches of their agency relationships.

162.    The Superior Defendants' breaches of their agency duties were willful and malicious, thus entitling Superior to an award of punitive or exemplary damages.

163.    Superior has suffered, and will continue to suffer, irreparable harm so as to entitle it to temporary, interlocutory, and permanent injunctive relief. Absent such equitable relief, the Court will not be able to make Superior whole.

## COUNT FIVE
## CONVERSION AND TROVER (AGAINST ALL DEFENDANTS)

164.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-163 above, as if set forth in full herein.

165.    Defendants have taken possession of and assumed the right of ownership over personal property belonging to Superior and its clients.  In addition to the unlawful computer acts detailed in this Complaint, Defendants Smalls and Diaz unlawfully gained access to Superior's offices on July 16, 2022 by blatantly lying to the building's security guard.  Smalls and Diaz also elicited the assistance of Diaz's husband and two unknown individuals in their blatant efforts break into Superior's offices and unlawfully steal boxes of client files without any legal authority to be in the offices much less removing client files. This egregious conduct is corroborated by the security footage of the events that took place on July 16, 2022.

166.    The property unlawfully taken by Defendants includes, but is not limited to, proprietary Superior client information, client business information, client business and individual tax returns, access codes and passwords, whether in tangible or electronic form that were not permitted by Superior to be used.

167.    Such items and information were at all times the property of Superior, and remained the property of Superior after the separation of the Superior Defendants' with Superior.

168.     Absent client permission to the contrary, Superior has an immediate and absolute right to possession of such property.

169.     Defendants unlawful taking and possession of Superior's property has caused and will continue to cause Superior irreparable harm so as to warrant an immediate temporary restraining order, as well as interlocutory and permanent injunctive relief requiring Defendants to immediately return all of Superior's property to Superior. Without such injunctive relief, the Court cannot make Superior whole.

**COUNT SIX**
**COMPUTER THEFT IN VIOLATION OF THE GEORGIA COMPUTER SYSTEMS PROTECTION ACT (AGAINST ALL  DEFENDANTS)**

170.     Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-169 above, as if set forth in full herein.

171.     During their employment with Superior, the Superior Defendants had the use of computers, computer systems, and electronic mailboxes, which were at all times the property of Superior (the Superior Computers). MGO and Berg sent the Superior Defendants secured links to upload proprietary information to MGO's computer systems while they were employed by Superior and without the consent of the Benson, the owner of Superior. Diaz, on behalf of MGO, continued to access Superior's computer systems after she was terminated for the benefit of MGO.

172.   The Superior Defendants violated O.C.G.A. § 16-9-93(a) of the Computer Systems Protection Act by using their Superior Computers, without authority, with the malicious intention of taking and appropriating Superior's valuable and confidential proprietary information for the benefit of themselves and MGO; (2) obtaining Superior's valuable and confidential proprietary information by deceitful and malicious means; and (3) converting Superior's valuable and confidential proprietary information for their own use during their employment at Superior in violation of a known legal obligation to only use their Superior Computers and information thereon for the benefit of Superior.

173.   As a result of the Superior Defendants' and Berg and MGO's actions in violation of O.C.G.A. § 16-9-93(a), Superior has been injured in an amount to be determined at trial.

174.   The Defendants' tortious actions were willful and malicious, thus entitling Superior to an award of punitive or exemplary damages.

175.   Pursuant to O.C.G.A. § 16-9-93(g), Defendants should be ordered to pay all damages caused by their actions as well as Superior's  attorneys' fees and costs associated with bringing this suit.

176.   The Defendants' actions were taken in whole or in part on behalf of MGO as employees and agents of MGO. Therefore, MGO is vicariously liable for

the Superior Defendants' tortious conduct.

## COUNT SEVEN
## COMPUTER TRESPASS IN VIOLATION OF
## THE GEORGIA COMPUTER SYSTEMS PROTECTION ACT (AGAINST
## ALL DEFENDANTS)

177.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-176 above, as if set forth in full herein.

178.    During their employment with Superior, the Superior Defendants had the use of their Superior Computers and access to the Superior Computer Systems, which were at all times the property of Superior.

179.    MGO and Berg sent the Superior Defendants secured links to upload proprietary information to MGO's computer systems while they were employed by Superior and without the consent of the Benson, the owner of Superior. Diaz, on behalf of MGO continued to access Superior's computer systems after she was terminated for the benefit of MGO.

180.    The Superior Defendants violated O.C.G.A. § 16-9-93(b) of the Computer Systems Protection Act by using their Superior computers and its systems, without authority, with the malicious intention of: (1) deleting or otherwise removing, either temporarily or permanently, data from the computers; (2) obstructing, interrupting, or otherwise interfering with Superior's  use of the data on

their computers; and (3) altering the information on Superior's computer systems and software used to service clients.

181.    As a result of Defendants' actions in violation of O.C.G.A. § 16-9-93(b), Superior has been injured in an amount to be determined at trial.

182.    Defendants' tortious actions, undertaken at the direction of MGO, were willful and  malicious, thus entitling Superior to an award of punitive or exemplary damages.

183.    Pursuant to O.C.G.A. § 16-9-93(g), Defendants should be ordered to pay all damages caused by their actions, as well as Superior's attorneys' fees and computer forensic expert fees, and costs associated with bringing this suit.

184.    The Superior Defendants actions were taken in whole or in part on behalf of MGO as employees and agents of MGO and at the direction of Berg. Therefore, MGO is vicariously liable for the Superior Defendants' and Berg's tortious conduct.

## COUNT EIGHT
## BREACH OF CONTRACT: CONFIDENTIALITY COVENANTS FOR MISAPPRIATION (AGAINST DIAZ, MARRAZZO AND ENGER)

185.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-184 above, as if set forth in full herein.

186.    Defendants Diaz, Marrazzo, and Enger agreed as part of the terms and

conditions of their employment, as set forth in their Employment Agreements that they would not use or disclose Superior's confidential information for the benefit of any other entity, including MGO, a direct competitor.

187.    The Defendants have breached, and continue to breach the Confidentiality Covenants found in their Agreements by using and disclosing Superior's trade secrets and confidential information for their own personal benefit and the benefit of their new employer, MGO, and to the detriment of Superior.

188.    Specifically, Defendants have used and disclosed, and continue to use and disclose, Superior's trade secrets and confidential information to unlawfully steal Superior's clients and develop an Atlanta office for MGO.

189.    As a result of Defendants' breaches of the Confidentiality Covenants, Superior has suffered, and continues to suffer, damages in an amount to be determined at trial.

190.    Defendants' breaches of the Confidentiality Covenants have caused and will continue to cause Superior irreparable harm so as to warrant temporary, interlocutory, and permanent injunctive relief against Diaz, Marrazzo, and Enger. Without such equitable relief, the Court will not be able to restore or repair the business relationships that will continue to be damaged by the Defendants' breaches of the Confidentiality Covenants.

## COUNT NINE
## BREACH OF CONTRACT: BREACH OF NON-SOLICITATION OF CUSTOMERS AND EMPLOYEES COVENANTS (AGAINST DIAZ, MARRAZZO, AND ENGER)

191.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-190 above, as if set forth in full herein.

192.    Defendants, as set forth in their Agreements regarding "Non-Solicitation" entered into valid and enforceable non-solicitation of employees and customers covenants, which prohibited Defendants from soliciting Superior employees and customers during their employment with Superior and for one year after their employment with Superior ended.

193.    The non-solicitation of employees and customers covenants are valid and enforceable because they are reasonable in duration and in scope.

194.    Defendants have breached the non-solicitation of employees and customers covenants by directly soliciting Superior's current employees and customers in an effort to entice Superior employees to accept employment at MGO and directly soliciting Superior customer's to move to MGO, while employed at Superior, and thereafter, for the benefit of MGO.

195.    As a result of Defendants' breach, Superior has suffered damages in an amount to be determined at trial.

196.    Defendants' breach of their restrictive covenants, during their

employment with Superior and thereafter, has caused and will continue to cause Superior damages so as to warrant temporary, interlocutory, and permanent injunctive relief. Without such equitable relief, the Court will not be able to restore or repair the employee relationships that will continue to be damaged or destroyed by Defendants' breach.

## COUNT TEN
## TORTIOUS INTERFERENCE WITH CONTRACTS BETWEEN DIAZ, MARRAZZO, AND ENGER (AGAINST  DEFENDANTS MGO AND BERG)

197.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-196 above, as if set forth in full herein.

198.    MGO and Berg have been, at all relevant times, aware of the Diaz's, Marrazzo's, and Enger's Agreements with Superior and the Confidentiality and Non-Solicitation of Employees and Customers Covenants contained therein.

199.    Despite having such knowledge, MGO and Berg induced, caused, and/or facilitated Defendants' Marrazzo, Diaz, and Eger to breach their Confidentiality Covenants and Non-Solicitation of Employees and Customers Covenants for the benefit of MGO

200.    MGO and Berg have benefited from the breaches of their Agreements.

201.    In inducing and causing Defendants to breach their Agreements, MGO and Berg acted with malice, bad faith, and with the intent to damage or destroy

Superior's business.

202.    MGO's and Berg's actions in inducing and causing Defendants to breach their Agreements were not privileged.

203.    Superior has been damaged as a direct and proximate cause of MGO's, and Berg's tortious interference with Defendants' Agreements.

204.    MGO's and Berg's tortious actions were willful and malicious, thus entitling Superior to an award of punitive or exemplary damages.

205.    Superior has suffered and will continue to suffer irreparable harm from Defendants' tortious actions so as to entitle it to temporary, interlocutory, and permanent injunctive relief. Absent such equitable relief, the Court will not be able to make Superior whole.

## COUNT ELEVEN
## TORTIOUS INTERFERENCE WITH CONTRACTS BETWEEN DIAZ, MARRAZZO, AND ENGER  AND SUPERIOR (AGAINST SMALLS)

206.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-205 above, as if set forth in full herein.

207.    Smalls has been, at all relevant times, aware of Diaz's, Marrazzo's, and Enger's Confidentiality Covenants and Restrictive Covenants regarding Non-Solicitation of Customers and Employees with Superior.

208.    Despite having such knowledge, Smalls induced, coerced by false

misrepresentation as to his ownership of Superior, and/or facilitated breaches of Diaz's Marrazzo's and Enger's Employment Agreements.

209.    Smalls has benefited from the breaches of their Agreements by obtaining employment as a Partner with MGO and stealing the majority of Superior's clients by unlawful means.

210.    In inducing and causing Diaz, Marrazzo, and Enger to breach their Agreements, Smalls acted with malice, bad faith, and with the intent to damage or destroy Superior's business to benefit himself and MGO.

211.    Smalls' actions in inducing and causing Diaz, Marrazzo, and Enger to breach their Agreements was not privileged.

212.    Superior has been damaged as a direct and proximate cause of Smalls' tortious interference with Diaz, Marrazzo, and Enger's Agreements.

213.    Smalls' tortious actions were willful and malicious, thus entitling Superior to an award of punitive or exemplary damages.

214.    Superior has suffered and will continue to suffer irreparable harm from Smalls' tortious actions so as to entitle it to temporary, interlocutory, and permanent injunctive relief. Absent such equitable relief, the Court will not be able to make Superior whole.

## COUNT TWELVE
## TORTIOUS INTERFERENCE WITH SUPERIOR'S RELATIONS WITH
## EMPLOYEES- CORPORATE RAIDING (AGAINST MGO AND BERG)

215.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-214 above, as if set forth in full herein.

216.    Superior maintains business relations with its employees and independent contractors.

217.    MGO and Berg have, at all relevant times, been aware of Superior's relations with its associates and employees. Despite having such knowledge, Berg and MGO have covertly tortiously interfered with Superior's employee relations with the intent to destroy Superior's business by pirating Superior's account managers to develop a competitive business against Superior.  Such acts have been done with malice and bad faith, without privilege, and with the intent to destroy Superior's  business.

218.    Superior  has been damaged as a direct and proximate cause of MGO and Berg's tortious conduct as detailed in the Complaint and exhibits attached thereto.

219.    MGO's and Berg's tortious actions were willful and malicious, thus entitling Superior to an award of punitive or exemplary damages.

220.    Superior has suffered and will continue to suffer irreparable harm from

MGO's and Berg's tortious actions so as to entitle it to temporary, interlocutory, and permanent injunctive relief. Absent such equitable relief, the Court will not be able to make Superior whole.

## COUNT THIRTEEN
## CIVIL CONSPIRACY

221.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-220 above, as if set forth in full herein.

222.    Defendants have expressly agreed, with a common design and purpose, to engage in unlawful and harmful acts towards Superior and have in fact engaged in such unlawful and harmful acts.

223.    Defendants engaged in extensive bad-faith clandestine conduct while working at Superior and starting their employment with MGO, including criminal trespass and theft, as described in this Complaint and the attached exhibits.

224.    Superior has been damaged as a direct and proximate cause of Defendants' tortious conduct.

225.    Defendants' tortious actions were willful and malicious, thus entitling Superior  to an award of punitive or exemplary damages.

226.    Superior has suffered and will continue to suffer irreparable harm from Defendants' tortious actions so as to warrant an immediate temporary restraining order, as well as a interlocutory, and permanent injunction against Defendants.

Absent such equitable relief, the Court will not be able to make Superior whole.

## COUNT FOURTEEN
## DEFAMATION-LIBEL

227.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-226 above, as if set forth in full herein.

228.    One or more Defendants made written false and malicious statements regarding Plaintiffs to Superior's clients and employees.

229.    One or more Defendants made either negligent and/or intentional written false and malicious statements with the intent to cause employees and clients to leave Superior and join MGO.

230.    One or more Defendants represented in writing to third parties, including Superior's clients and employees, that Plaintiffs were not able to handle their business and the clients would be better served by moving their business to MGO.

231.    Defendants have caused harm to Plaintiffs, including but not limited to, the loss of reputation and loss of business.

232.    One or more of the Defendants' written statements directly caused at least seven of Superior's client to terminate their business with Superior and retain MGO under the basis of such false and defamatory statements.

233.    One or more of the Defendants' written statements directly caused at least two employees to terminate their employment with Plaintiffs and join MGO under the supervision of Smalls and Diaz.

234.    Defendants had no basis for the allegations, other than to solicit Plaintiffs' clients and employees to join MGO.

235.    Defendants are liable to Plaintiffs for written defamation pursuant to O.C.G.A. § 51-5-3.

**COUNT FIFTEEN**
**DEFAMATION SLANDER**
**(AGAINST ALL DEFENDANTS**

236.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-235 above, as if set forth in full herein.

237.    Upon information and belief, one or more Defendants made derogatory statements to Superior's clients and employees' regarding Superior's competency to handle their accounts and manage their business and Benson.

238.    One or more of the Defendants made oral statements to third parties that Plaintiffs' business was worthless.

239.    In order to entice Superior's clients to join MGO, one or more of Defendants made oral statements to Superior's clients that Plaintiffs were incapable of fulfilling its duties to its clients.

240.    These false and defamatory oral statements have injured Plaintiffs' reputation and business.

241.    As a result of Defendants' oral statements, at least six of Plaintiffs' clients have taken actions to terminate their relationship with Superior to join MGO.

242.    At a minimum, the termination of these client relationships is a loss of business to Plaintiffs in the amount of over one million dollars in annual revenue.

243.    These false and defamatory statements were made in bad faith and expressly intended to destroy the reputation of Plaintiffs, and to damage the reputation of Plaintiffs, in order for clients and employees of Plaintiffs to join MGO, steal Superior's clients and confidential information, and capitalize on their tortious conduct.

244.    The Defendants' false defamatory statements are per se defamation pursuant to O.C.G.A. § 51-5-4 (a) (2).

## COUNT SIXTEEN
## ATTORNEYS' FEES AND COSTS OF LITIGATION
## (AGAINST ALL DEFENDANTS)

245.    Plaintiffs hereby incorporate and re-allege the allegations set forth in Paragraphs 1-244 above, as if set forth in full herein.

246.    As set forth extensively in the factual section of this Complaint, Defendants have behaved egregiously toward Plaintiffs, acted maliciously and  in

bad faith, unlawfully broke into Plaintiffs' offices with several unknown persons and removed large quantities of valuable proprietary files that belonged to Plaintiffs, have caused Plaintiffs to have to retain expensive computer forensic examiners to examine its computer systems due to Defendants unlawful uploading of client information in violation of federal law, thereby entitling Plaintiffs to an award of attorneys' fees and expenses of litigation, including recovery of all computer forensic audit and examination costs due to Defendants conduct, pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief against Defendants:

(a)     Enter judgment against Defendants for misappropriation of Superior's trade secrets, and

       (i)     award Plaintiffs a temporary restraining order, as well as interlocutory and permanent injunctive relief ordering Defendants not to misappropriate, use or disclose (or attempt to misappropriate, use, or disclose) any trade secrets or other confidential information belonging to Superior, including but not limited to requiring the Defendants to return any and all

Superior information unlawfully in their possession;

(ii) award Plaintiffs a temporary restraining order, as well as interlocutory and permanent injunctive relief, ordering Defendants not to solicit or service any Superior customer, former customer, or prospective customer about which Defendants' misappropriated Superior's trade secrets;

(iii) award Plaintiffs actual, compensatory, and punitive damages resulting from Defendants' misappropriation;

(iv) award Plaintiffs the value of Defendants' unjust enrichment caused by Defendants' misappropriation;

(v) order the disgorgement of any monies earned by Defendants as a result of their unlawful theft, trespass, computer trespass, and misappropriation;

(vi) award Plaintiffs its costs, including forensic expert fees, and attorneys' fees under O.C.G.A. § 10-l-763(b);

(vii) prohibit the Superior Defendants from working for MGO in any capacity;

(viii) mandate that MGO provide an affidavit of certification that it has not received nor does it plan to use any proprietary information

of Superior that it received, directly or indirectly, in any manner or by any means from the Superior Defendants; and

(ix)    order MGO and the Superior Defendants to cease and desist from accessing or attempting to access any Superior proprietary information without express client consent to Superior and prohibiting Defendants from unlawfully accessing computer Superior's computer systems.

(b)    Enter judgment against the Superior Defendants for their breach of duty of loyalty to Superior and award Plaintiffs actual, compensatory, and punitive damages, a temporary restraining order, and interlocutory and permanent injunctive relief;

(c)    Enter judgment against the Superior Defendants for their breach of agency to Superior and award Plaintiffs actual, compensatory, and punitive damages, a temporary restraining order, and interlocutory and permanent injunctive relief;

(d)    Enter judgment against the Superior Defendants for conversion of Plaintiffs' property, and enter a temporary restraining order, interlocutory and permanent injunctive relief and order the Superior Defendants to immediately return all Superior property to Superior and to not return to Superior's offices;

(e)   Enter judgment against Defendants for theft, computer theft and computer trespass in violation of the Georgia Computer Systems Protection Act, and

(i)   award Plaintiffs actual and compensatory damages resulting from such violation; and

(ii)   award Plaintiffs its costs, including forensic expert's fees, and attorneys' fees under O.C.G.A. § 16-9-93(g);

(f)   Order the Superior Defendants to immediately turn over, for the purpose of evidence preservation, all of their computer and other electronic devices capable of receiving and sending emails and/or storing electronic information to Plaintiffs' third party computer forensics auditor Greg Fordham;

(g)   Enter judgment against Diaz, Marrazzo and Enger for their breaches of their Employment Agreements, including breaches of their restrictive covenants prohibiting solicitation of customers and employees and award Plaintiffs actual, compensatory, punitive damages, attorneys' fees, a temporary restraining order, and interlocutory and permanent injunctive relief as a result of the breaches of the Employment Agreements;

(h)   Enter judgment against MGO, Berg, and Smalls for tortious interference with the contracts between Diaz, Marrazzo, and Enger and Superior; and

      (i)     award Plaintiffs a temporary restraining order, interlocutory injunction, and permanent injunctive relief ordering Defendants to cease its interference with the Superior Defendants' contractual obligations to Superior;

      (ii)     award Plaintiffs all damages caused by Defendants' tortious interference with the contracts, including but not limited to, Superior's lost profits and MGO's unjust enrichment resulting from the Superior Defendants' breaches of contract, including damages for unlawful breaking and entering into Superior offices to retrieve client files for the benefit of MGO; and

      (iii)    award Plaintiffs punitive damages;

   (i)     Enter judgment against Smalls for tortious interference with the contracts between Diaz, Marrazzo, and Enger and Superior; and

      (i)     award Plaintiffs a temporary restraining order, interlocutory injunction, and permanent injunctive relief ordering Smalls to cease its interference with Diaz's, Marrazzo's, and Enger's contractual obligations to Superior;

      (ii)     award Plaintiffs all damages caused by Smalls' tortious interference with the former employees contracts, including but

not limited to, Superior's lost revenue and Smalls' unjust enrichment resulting from Diaz, Marrazzo, and Enger's breach of their contracts for the benefit of Smalls; and

    (iii)   award Plaintiffs punitive damages;

(j)    Enter judgment against Defendants for tortious interference with Superior's relations with Superior's employees; and

    (i)   award Plaintiffs all damages caused by Defendants' tortious interference; and

    (ii)   award Plaintiffs punitive damages;

(k)    Enter judgment against Defendants for their engagement in a civil conspiracy against Plaintiffs to destroy Superior's business by stealing the majority of its clients, its referral sources, and its employees;

(l)    Award Plaintiffs its costs, including computer forensic expenses, and attorneys' fees under O.C.G.A. § 13-6-11; and

(m)    Order such other relief as the Court may deem just and proper.

Respectfully submitted this 20th day of July 2022

By: */s/ Christine S. Tenley*

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
600 Peachtree Street NE, Suite 4700
Atlanta, Georgia 30308
Telephone: 404.348.8585
Facsimile: 404.467.8845
christine.tenley@lewisbrisbois.com
victoria.munian@lewisbrisbois.com

CHRISTINE S. TENLEY
Georgia Bar No. 702145
VICTORIA E. MUNIAN
Georgia Bar No. 463486

*Attorneys for Plaintiffs Superior Business Management, LLC and Superior Tax Solutions, LLC and Kris Benson*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 5.1 and L.R. 7.1(D), the undersigned hereby certify that the foregoing **PLAINTIFFS' COMPLAINT FOR DAMAGES AND TEMPORARY, INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF** was prepared using 14-point Times New Roman font.

Respectfully submitted this 20th day of July, 2022.


By: */s/ Christine S. Tenley*

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
600 Peachtree Street NE, Suite 4700
Atlanta, Georgia 30308
Telephone: 404.348.8585
Facsimile: 404.467.8845
christine.tenley@lewisbrisbois.com
victoria.munian@lewisbrisbois.com

CHRISTINE S. TENLEY
Georgia Bar No. 702145
VICTORIA E. MUNIAN
Georgia Bar No. 463486

*Attorneys for Plaintiffs Superior Business Management, LLC and Superior Tax Solutions, LLC and Kris Benson*